UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**BEVERLY ANN GLADNEY,**

    Plaintiff,

  v.                                                               Case No. 18-CV-1580

**ANDREW M. SAUL,**
**Commissioner of Social Security,**

    Defendant.

---

## DECISION AND ORDER

---

Beverly Ann Gladney seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying her claim for a period of disability and disability insurance benefits and for supplemental security income under the Social Security Act, 42 U.S.C. § 405(g). For the reasons stated below, the Commissioner's decision will be affirmed and the case dismissed.

## BACKGROUND

On September 24, 2014, Gladney applied for supplemental security income and disability insurance benefits, alleging disability due to carbon monoxide poisoning beginning on January 31, 2012. (Tr. 15.) The claims were denied initially and upon reconsideration. (*Id.*) A hearing was held before an Administrative Law Judge ("ALJ") on August 4, 2017. (Tr. 34–86.) Gladney appeared and testified, as did a vocational expert ("VE"). (*Id.*)

In a written decision issued December 27, 2017, the ALJ found that Gladney had the following severe impairments: anxiety, somatic symptom disorder, mild neurocognitive disorder, and bilateral carpal tunnel syndrome. (Tr. 18.) The ALJ found that Gladney had the non-severe medically determinable impairments of gastritis, palpitations, benign hypertension, and chronic small vessel ischemic changes. (*Id.*) The ALJ found that she did not have an impairment or a combination of impairments that met or medically equalled one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "listings"). (Tr. 18–20.) The ALJ further found that Gladney had the residual function capacity ("RFC") to perform less than the full range of light work, with the following limitations: lift and carry 20 pounds occasionally and 10 pounds frequently, sit for about 6 hours per 8-hour day, and stand or walk about 6 hours per 8-hour workday; push or pull as much as she can lift and carry; never climb ladders, ropes, or scaffolds; frequently handle and finger with the bilateral upper extremities; no production rate pace work; able to understand, remember, and carry out simple instructions; only occasional work-related decisions and only occasional changes in the work setting; frequent interaction with supervisors, co-workers, and the public; no more than moderate noise intensity; and light intensity consistent with what is found in a typical office setting. (Tr. 20–21.)

The ALJ found that Gladney was unable to perform any past relevant work. (Tr. 24.) Nevertheless, considering Gladney's age, education, work experience, and RFC, the ALJ found that there existed jobs in significant numbers that Gladney could perform. (Tr. 25.) Therefore, the ALJ concluded that Gladney was not under a disability from January 31, 2012 through the date of the decision. (Tr. 26.)

The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Gladney's request for review. (Tr. 1–5.)

## DISCUSSION

### *1.  Applicable Legal Standards*

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is not conclusive evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (internal quotation and citation omitted). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

### 2. *Application to This Case*

Gladney, who represented herself at the administrative level and in this proceeding, makes several arguments for reversal. I construe her arguments broadly as follows: First, Gladney argues that the ALJ erred in not finding that she suffered the medically determinable impairments of carbon monoxide poisoning and mold poisoning. (Plaintiff's Br. at 1–2, Docket # 13; Reply Br. at 1–2, 3–4, 6, 7, Docket # 19.) Second, Gladney argues that the ALJ erred in failing to find that her carbon monoxide poisoning and/or black mold poisoning met or equaled one of the listings. (Plaintiff's Br. at 1, 3; Reply Br. at 7.) Third, Gladney contends that the ALJ improperly discounted her subjective complaints. (Plaintiff's Br. at 3.) Finally, Gladney argues that the ALJ gave too much weight to the medical source opinions in the record. (Reply Br. at 2.) I will address each in turn.

#### 2.1 Medically Determinable Impairments

Gladney appears to argue that the ALJ erred at Step Two in not finding that she suffered the medically determinable impairments of carbon monoxide poisoning and black mold poisoning. (Plaintiff's Br. at 1–2; Reply Br. at 1–2, 3–4, 6, 7.) Gladney asserts that she was exposed to carbon monoxide from a gas leak in her apartment from 2008 to 2012, and to toxic black mold in 2016. She points to records from a hospital visit in 2012 in which she presented with elevated blood pressure and reported that she suspected carbon monoxide poisoning, and a blood test at a follow-up visit several days later revealing an elevated carbon monoxide level. (Reply Br. at 3–4.) She asserts that problems with memory, comprehension, focusing, and concentrating were attributed to carbon monoxide poisoning on two separate occasions. (*Id.* at 5–6.)

4

I do not find that the ALJ erred in this regard. As the ALJ pointed out, under SSR 06-3p[1], medically determinable impairments can only be established by evidence from "acceptable medical sources"—as relevant here, that means licensed physicians. (Tr. 18.) Gladney does not identify any evidence in the record of any physician diagnosing her with carbon monoxide poisoning or mold poisoning, and I find none.

In January and February of 2012, Gladney sought treatment four times at four locations for what she believed was carbon monoxide poisoning. On January 6, 2012, Gladney presented at the Froedtert emergency department expressing concern about carbon monoxide poisoning, but the provider was doubtful and the test for carbon monoxide was negative.[2] (Tr. 485–516.) The provider indicated that "[o]verall her symptom constellation is more [consistent with] anxiety" and did not diagnose Gladney with carbon monoxide poisoning. (Tr. 493, 516.) Four days later, on January 10, 2012, Gladney reported to the Wheaton Franciscan St. Joseph urgent care with elevated blood pressure and reported a gas leak in her home five days earlier. (Tr. 517–18.) She was diagnosed with systolic hypertension, but not carbon monoxide poisoning. (Tr. 519.) At a follow-up the next day, the provider noted that Gladney feared she had carbon monoxide poisoning, but did not diagnose her with it. (Tr. 713–14.) Even after Gladney's level came back slightly elevated, at 2.3%, with the normal range for a non-smoker being 0.5–2.0% (Tr. 730), the provider on follow-up characterized her carbon monoxide level as "normal" and continued to explore other possible causes for her symptoms. (Tr. 711–12.)

---

[1] Rescinded for claims filed on or after March 27, 2017.
[2] Gladney's carbon monoxide level was 1.1%, with the normal value for non-smokers (of which Gladney reportedly was one) being 1.0–2.0%. (Tr. 497.)

5

On February 16, 2012, Gladney went to Aurora urgent care complaining of symptoms caused by another gas leak. (Tr. 739–42.) She was not diagnosed with carbon monoxide poisoning. (Tr. 741.) Then on February 24, 2012, Gladney presented at the Wheaton Franciscan emergency department complaining of carbon monoxide poisoning, and her carbon monoxide level was 2.8%. Although the record contains what appear to be standard discharge instructions for "Carbon Monoxide Poisoning" (Tr. 525), the actual diagnoses listed in her chart were "Ill-defined disease" and "Anxiety" (Tr. 524).

On May 22, 2012, Gladney saw a new primary care provider, who noted that Gladney believed her symptoms were due to carbon monoxide poisoning, but did not indicate agreement. (Tr. 749.) The provider ordered a repeat carbon monoxide level, which records indicate came back at 4.7% and was categorized as "abnormal." (Tr. 758.) However, the record does not include a follow-up visit with this provider, any interpretation of this result by a physician, or any diagnosis of carbon monoxide poisoning associated with this result.

Gladney complained of carbon monoxide poisoning intermittently over the following several years, but as in 2012, no physician concurred in her self-diagnosis.[3] (See, e.g., Tr. 778–80, 884, 902.) In August 2014, Gladney presented at an emergency department in Texas complaining of exposure to a gas leak and with a carbon monoxide level of 1.6%, slightly above the reference range of 0–1.5%, but the notes state "Ruled out impressions: Carbon monoxide exposure." (Tr. 698.) In November 2014, Gladney's gynecologist noted

---

[3] Gladney's 2016 neuropsychological evaluation noted that Gladney reported a history of carbon monoxide exposure and believed her symptoms resulted from it (Tr. 868, 869), and stated that her cognitive deficits would be consistent with carbon monoxide exposure and listed this as a diagnostic impression (Tr. 872, 873). However, the authors of the report were not licensed physicians and

that while Gladney believed her "multiple diffuse somatic complaints" were due to chronic carbon monoxide poisoning, extensive medical workups had been negative. (Tr. 709.) In June 2016, Gladney reported to the Wheaton Franciscan St. Joseph emergency room complaining of carbon monoxide poisoning or mold poisoning, but the provider noted that Gladney had "no history to suggest carbon monoxide poisoning [and] her [CO detector] unit did not alarm today." (Tr. 922.)

Neither State Agency reviewing physician opined that Gladney had the medically determinable impairment of carbon monoxide exposure. At the initial level, Janis Byrd, MD noted that Gladney had had extensive evaluations and work-ups by multiple providers and specialists in multiple clinics in multiple states, and carbon monoxide poisoning had been ruled out on multiple occasions. (Tr. 95, 110.) Therefore, Dr. Byrd did not find that Gladney had the medically determinable impairment of carbon monoxide poisoning. (*Id.*) On reconsideration, Mina Khorshidi, MD, explained that Gladney had been seen numerous times by a large number of sources, who had suspected hypochondriasis and diagnosed her with anxiety and psychosomatic disorder, and the evidence had ruled out carbon monoxide poisoning several times. (Tr. 125, 139.)

Because no evidence from any acceptable medical source supported Gladney's claim to have suffered carbon monoxide poisoning, the ALJ did not err in failing to find the medically determinable impairment of carbon monoxide poisoning. The ALJ likewise did not err regarding Gladney's allegations about toxic mold exposure, as there is no medical evidence from any acceptable medical source to support a finding of such an impairment.

---

therefore were not qualified to identify such an impairment under the regulations.

There are just two notes in the record mentioning mold at all, indicating only that Gladney twice told providers in 2016 that she believed her symptoms were caused by toxic mold. (Tr. 902, 922.) Thus, the ALJ did not err in failing to find that Gladney suffered either of these medically determinable impairments.

2.2   Listings

Gladney argues that the ALJ erred at Step Three in finding that her impairments did not meet or equal one of the listings. (Plaintiff's Br. at 3; Reply Br. at 7.) Gladney's argument is difficult to follow, as she does not identify any listing under which she believes the ALJ ought to have found her disabled.

The plaintiff has the burden of showing that her medically determinable impairments meet or medically equal a listing. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). To establish that an impairment or combination of impairments meet or are equivalent to a listed impairment, a plaintiff must present medical findings that meet or are equal in severity to all of the criteria in a listing. *Sullivan v. Zebley*, 493 U.S. 521, 530–31 (1990) (citing SSR 83–19 at 91). Gladney does not argue that she has done this. Rather, Gladney argues that she meets a listing because she suffers from physical and mental impairments due to carbon monoxide poisoning and toxic black mold poisoning that prevent her from working. (Plaintiff's Br. at 1–2.) Because carbon monoxide poisoning and toxic mold exposure were not found by the ALJ to be medically determinable impairments at Step Two, the ALJ did not err in failing to find that they met or medically equaled a listing at Step Three.

In all other material respects, I perceive no error in the ALJ's listings analysis. The ALJ explained that he considered Gladney's impairments singly and in combination, and

8

concluded that they did not meet or medically equal the criteria for any listing. (Tr. 19.) He evaluated Gladney's carpal tunnel syndrome under Listing 11.14 (peripheral neuropathies) and her mental impairments under Listing 12.02 (neurocognitive disorders), Listing 12.06 (anxiety disorders), and 12.07 (somatic symptoms and related disorders). (Tr. 19–20.) The ALJ thoroughly explained that the relevant criteria for these listings were not satisfied, providing appropriate citations to supporting evidence. (*Id.*) Additionally, as the ALJ explained, Gladney's impairments could not be found to equal a listing because there was no opinion by an appropriate medical or psychological source stating that her impairment equaled a listing, as required by the regulations to find equivalency. (Tr. 18, 20.)

Because the ALJ properly found that Gladney's impairments did not meet or equal a listing, reversal is not warranted on this basis.

### 2.3 Subjective Complaints

Gladney states that the ALJ ignored, or did not take into account or consideration, "my symptoms, my statements, or my evidence." (Plaintiff's Br. at 3.) In context, I construe this as an argument that the ALJ improperly discounted her reported symptoms of carbon monoxide and mold poisoning. (*Id.* at 1–3.)

The Commissioner's regulations set forth a two-step test for evaluating a claimant's statements regarding his symptoms. First, the ALJ must determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p. Second, if the claimant has such an impairment, the ALJ must evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to work. *Id.* If the statements are not substantiated

9

by objective medical evidence, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms based on the entire record and considering a variety of factors, including the claimant's daily activities; the location, duration, frequency, and intensity of the symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes; treatment, other than medication, used for relief of the symptoms; other measures the claimant uses to relieve the symptoms; and any other factors concerning the claimant's functional limitations due to the symptoms. *Id.*

A court's review of a credibility, or consistency, determination is "extremely deferential." *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013). On judicial review, courts "merely examine whether the ALJ's determination was reasoned and supported." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (citing *Jens v. Barnhart*, 347 F.3d 209, 213–14 (7th Cir. 2003)). "It is only when the ALJ's determination lacks any explanation or support that we will declare it to be patently wrong . . . and deserving of reversal." *Id.* at 413–14 (internal quotation marks and citations omitted).

Because carbon monoxide poisoning and mold poisoning were not among the medically determinable impairments that the ALJ found at Step Two, the ALJ's failure to credit Gladney's alleged symptoms of those impairments was not error. The ALJ pointed out that testing in January 2012 revealed that Gladney's carbon monoxide levels were within normal limits, and treatment notes indicated that her symptoms were more consistent with anxiety rather than carbon monoxide poisoning. (Tr. 22.) The ALJ also pointed to treatment notes indicating that Gladney might have hypochondriasis. (*Id.*) The

ALJ did not err in failing to credit Gladney's symptoms insofar as they were claimed to be based on carbon monoxide poisoning or mold poisoning, which were not medically determinable impairments.

The ALJ did not otherwise err in his evaluation of Gladney's symptoms. He found that her medically determinable impairments could reasonably cause some of her alleged symptoms, but that her statements concerning the intensity, persistence, and limiting effects of her symptoms not entirely consistent with the medical evidence and other evidence in the record. (*Id.*) Regarding her mental health, the ALJ pointed to evidence that Gladney suffers from a somatic symptom disorder, a mild memory impairment, and a mild neurocognitive disorder. (Tr. 22.) The ALJ explained that Gladney had never been hospitalized, received specialized treatment, or taken any medication for any mental impairment, nor sought any treatment for her anxiety. (*Id.*) Despite her anxiety, her mental status findings were normal. (*Id.*) Regarding her complaints of chronic pain, numbness, and tingling in her wrists and hands, the ALJ noted that Gladney had objectively identifiable carpal tunnel syndrome; however, her decision to postpone surgery suggested that her symptoms were "not at a disabling degree of severity," and there was no documented treatment for her carpal tunnel syndrome after November 2016. (Tr. 22–23.) Because the ALJ provided sufficient rationale supported by the record for his evaluation of Gladney's symptoms, reversal is not warranted on this basis.

### 2.4 Weight Given to Non-Examining Sources

Finally, Gladney faults the ALJ for giving weight to the opinions of sources who were not specialists in environmental toxins, including all the State Agency consultants,

consultative examining psychologist Joan R. Nutall, Ph.D., and examining neuropsychologist Patricia C. Stanik, Ph.D. (Reply Br. at 2.) Gladney also faults the ALJ for relying on the opinions of non-examining sources, presumably the State Agency consultants. (*Id.*)

An ALJ must consider all medical opinions in the record, but the method of evaluation varies depending on the source. Medical opinions from treating sources may be given controlling weight in some circumstances. 20 C.F.R. § 404.1521(c)(2).[4] For all other medical opinions, the ALJ assigns weight after considering the following factors: examining relationship; length of the treatment relationship and the frequency of examination; nature and extent of the treatment relationship; whether the medical opinion is supported by medical signs and laboratory findings; consistency with the record as a whole; specialization of the medical source; and any other factors that tend to support or contradict the medical opinion. 20 C.F.R. § 404.1521(c). Section 404.1521(c)(3) specifies that the weight assigned to non-examining sources will depend on the degree to which they provide supporting explanations for their medical opinions, and that the ALJ will evaluate the degree to which the opinions of non-examining sources consider all of the pertinent evidence in the claim, including medical opinions of treating and other examining sources. The ALJ should explain the weight given to opinions from these sources such that the claimant or a subsequent reviewer can follow the ALJ's reasoning. 20 C.F.R. § 404.1527(f)(2).

The ALJ did not err in assigning weight to the medical sources in Gladney's case. There are no medical opinions from treating sources as defined in 20 C.F.R. § 404.1527(a)

---

[4] Applicable to claims filed before March 27, 2017.

in the record, so no opinion was entitled to controlling weight. There were two examining source statements in the record, the consultative psychological examination by Dr. Nuttall (Tr. 845–48) and the neuropsychological evaluation by Dr. Stanik (868–74). Dr. Nuttall opined that Gladney had no significant mental limitations, a conclusion the ALJ gave little weight, finding it inconsistent with the evidence of anxiety, somatoform disorder, and neurocognitive delay. (Tr. 23.) The ALJ thus included mental limitations in the RFC despite Nuttall's opinion that Gladney had no such limitations. (*Id.*) The little weight given to Dr. Nuttall's opinion helped Gladney's case for benefits; it is unclear why or how Gladney believes the ALJ should have given even less weight to Dr. Nuttall's opinion.

Dr. Stanik opined that Gladney would have moderately to severely impaired ability to solve complex problems and difficulty understanding instructions, scheduling, adjusting to changing situations, and making decisions. (*Id.*) The ALJ gave this opinion some weight, explaining that limits in understanding, remembering, and adapting were supported by evidence in the record. (*Id.*) The ALJ thus included in the RFC limitations for understanding, remembering, and carrying out simple instructions only, and performing work that involves only occasional work-related decisions and only occasional changes in the work setting. (Tr. 21.) Thus, the ALJ adequately explained the weight given to Dr. Stanik's opinion. Gladney does not specify in what way the ALJ's treatment of Dr. Stanik's opinion was improper, and I perceive no error.

The State Agency consulting psychologists opined that Gladney would have moderate limitations carrying out detailed instructions, maintaining a schedule, making simple work-related decisions, completing a workday, and interacting with the public. (Tr.

23.) They found Gladney capable of carrying out simple instructions, making simple decisions, concentrating for two hours at a time, interacting with coworkers and supervisors, and having occasional contact with the public. (Tr. 23–24.) The ALJ gave these opinions considerable weight for the types of difficulties experienced by Gladney, explaining that they were consistent with the evidence of anxiety, somatoform disorder, and some neurocognitive delay. (Tr. 24.)

The State Agency medical consultants found that Gladney did not suffer from any severe physical impairments. (*Id.*) The ALJ gave this little weight, explaining that these sources had not had the additional evidence that was available after the reconsideration determination, including subsequent medical evidence and hearing testimony, which supported the addition of some severe and non-severe physical impairments. (*Id.*) The ALJ also explained that these sources had not adequately considered Gladney's subjective complaints, which the ALJ found merited more generous consideration. (*Id.*) As with Dr. Nuttall's opinion, the ALJ's evaluation of this evidence was highly favorable to Gladney.

In sum, the ALJ did not err in assigning weight to the opinions in the record. The ALJ adequately explained the weight given and the reasons for assigning that weight. Furthermore, while Gladney faults the ALJ for relying on these opinions, the ALJ largely rejected them as not restrictive enough and found Gladney more limited than these sources opined. Reversal is not warranted on this basis.

## CONCLUSION

It is entirely possible that Gladney suffered carbon monoxide poisoning and/or mold poisoning. However, on the record before him, the ALJ did not err in concluding that

Gladney was not disabled on that basis, or on any other basis. The ALJ supported his decision with substantial evidence and properly applied the regulations. Therefore, the Commissioner's decision will be affirmed and the case dismissed.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the Commissioner's decision is **AFFIRMED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 26th day of November, 2019.

BY THE COURT:

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge